Good morning, Your Honors, and may it please the Court, Damien Schiff for the Appellant's Homebuilders. With the Court's permission, I would like to reserve two minutes of my time for rebuttal. You may. Just watch the clock. Thank you. The critical habitat designation for the 15 vernal pool species is illegal because in at least five ways it is inconsistent with the statutory standard that Congress has established for critical habitat. And each of those five Before you go into each of the five, this is a really crazy question, but if you could answer it, it might just be helpful for perspective to me. What is it about this that really bugs you? Well, Your Honor I understand you've got five discrete, you know, kind of almost technical points, but what's the heart of your complaint? Well, certainly, Your Honor, in terms of injury, the injury is significant. It's principally an economic injury in that we are homebuilders, developers, and therefore the critical habitat designation adds a significant cost to development. In fact, the Fish and Wildlife Service's own economic impact analysis, deficient though it was, estimated that even without the or even taking out the economic exclusions, there was probably over $100 million of economic impact. Now, in terms of what would happen if, in fact, the critical habitat designation were done properly, our view is that we would have a smaller designation that would be more effective, one that would not have so much acreage of critical habitat that is, in fact, not critical habitat, that is, in fact, areas that have no biological power to facilitate the recovery of these 15 species. That's really the heart of the matter. The question is, if we are going to impose burdens on private property owners in this country, at the very least, we should be sure that it is being done in a way that makes sense. And our contention is that because the Fish and Wildlife Service violated the standards for critical habitat, we have no guarantee that this land is, in fact, going to serve its purpose of facilitating the recovery of the 15 vernal pool species. So if we were to find in your favor we would order a remand, what would be the next step here? That's correct, Your Honor. We are asking just for a remand and vacator of the critical habitat designation during the remand. But what we would ask is, on remand, the Court instruct the service to apply the proper statutory standard. If the service then applying that standard to the same administrative record produces a different critical And that would be the end of this case. But at this point, all we are asking the service to do is to apply the correct legal standard. And in that sense, all of the arguments, although technical they may be, are entirely separate from questions of best available data, entirely separate from questions of what's in the administrative record. The arguments that we advance are based simply on the text of the statute, what Congress has defined occupied critical habitat to require. To that extent, most of, not all of the arguments raised by the government and by the environmental intervenors are entirely an opposite. And with respect to those particular errors, perhaps the most important errors that the service committed, that the service concedes that it has committed, is the fact that it has included within occupied critical habitat areas that are unoccupied, as well as areas that contain none of those elements that the service has determined essential to the conservation of the species. So by definition, the service has conceded that there are areas that do not qualify as critical habitat within the current designation. And the only excuse that the service or the environmental intervenors have offered as to why that's all right is simply because we don't have enough time, we don't have enough money, we don't have enough manpower to follow the statutory standard. That excuse has never been considered adequate in response to fulfilling the service's obligations under the Endangered Species Act. This Court in the Environmental Defense Center case cited in the briefs, the Tenth Circuit and the Forest Guardians case have both said that the service cannot avoid the mandate of Congress by saying that we don't have time, we don't have enough money. It has to be done properly or not at all. And the answer is not that there should be more critical habitat designated that is of marginal quality. The answer is less is more. If, in fact, what we are talking about is area of habitat that can really serve the conservation of the species, it makes sense that less may be more. It makes sense that the service should focus on those areas that do, in fact, have all of the elements essential to the species conservation rather than designating marginal habitat, rather than designating, as the service concedes, areas within critical habitat that include structures, paved roads, boat ramps, areas that clearly have absolutely nothing to do with the biology of these species, with its conservation or potential recovery. The service also argues that we are trying to impose upon the service a statutory deadline that the statute does not impose, meaning that what we're essentially asking the service to do is to produce a recovery plan now before it can designate critical habitat. And that is not true, because what a recovery plan requires is two things. It requires both knowing when these species will be conserved, but it also requires, much more importantly, site-specific identification of the means of recovery. How do we get to that final endpoint of recovery? That aspect of recovery plan formulation we do not require and the statute does not require under critical habitat. The only thing that the statute requires under critical habitat is simply a knowledge of conservation. That requirement is not fabricated as a matter of litigation. It is in the statute itself. The statute defines occupied critical habitat as those areas containing the physical or biological elements essential to the conservation of the species. One cannot know what elements are essential to the conservation of the species unless one knows when a species can be deemed conserved. Lastly, in addition to the critical habitat designation itself, the service's economic impact analysis is fundamentally flawed, because the service did not assess the cumulative economic impact of the critical habitat designation. Now, again, the service and the environmental interveners say that there is no such requirement that we're trying to import NEPA or other requirements into the critical habitat economic impact analysis. But the question really boils down to what is an honest and non-arbitrary way of assessing the economic impact of any activity? It is the old saw about the straw that breaks the camel's back. If you ask what is the impact of the straw, well, if you look at the straw itself, you can say, well, it's simply adding a gram or less of weight onto the camel. But in the real-world impact, what it's doing is breaking the camel's back. And the same thing applies, the same reasoning applies with respect to critical habitat economic impact analysis. One cannot simply look at the analysis of the impact of critical habitat in a vacuum. It only makes sense to understand what its true impact is by looking at how it will affect the areas that are designated in light of existing federal, state, and local land use regulation. Without that cumulative impact analysis, the analysis that was in fact done is arbitrary and inadequate. If the Court does not have any further questions, I would like to reserve the balance of my time for rebuttal. Thank you. Robert Oakley, Jr. Good morning. May it please the Court, my name is Robert Oakley. I'm from the Department of Justice and I'm representing the Fish and Wildlife Service in this case. Let me begin with a general observation here. What homebuilders are trying to do is homebuilders are trying to import into the statute requirements that have no textual support in the language of the statute. Now you heard counsel for homebuilders say, we're not talking about the administrative record here, we're not talking about the sufficiency of the record, we're talking about the statute. But you didn't hear him quote the statute, you won't find him quoting the statute in the brief. But secondly, those requirements that he's trying to import will make it either difficult or impossible for the Fish and Wildlife Service to designate critical habitat for species. Now let me go through, I can go through his arguments and tie that specifically. But basically the idea here is, and I think the point was emphasized by counsel, when you ask, and I think Judge Reimer said, what bothers you, what do you want? And he said he wants this rule vacated. Now he's relying on cases like Gifford-Pinchot where the service was criticized and ultimately reversed by this Court for not designating enough critical habitat because it didn't provide in the Gifford-Pinchot case, it didn't meet the not just simply survival but the recovery standard. He's trying to use cases like that to say just take away all critical habitat designation whatsoever. Leave the species without any critical habitat designation until the service gets it right. Not go back and refine it. Not go back and maybe designate more. He sure doesn't want that. But get rid of it altogether. So these are kind of Trojan horse arguments. They are using language from cases and from decisions saying service, go do more. But they're being used to say service don't do anything at all. Let's go to the first. Now this has to do whether every unit designated from critical habitat must have all what are called in the regulations primary constituent elements. These are things like things for nesting, things for food, breeding, all the things that a species needs to survive. He's saying you've got to have every single one of them in a unit for critical habitat or you can't designate it. Where does he find that? Where does it say that in the statute? He's saying that this is all coming from the statute. But he doesn't cite the statute on that. He refers vaguely to Gifford-Pinchot but you can't even find that in Gifford-Pinchot. Now, logically, as we pointed out in the brief, that can lead to cases where you couldn't designate critical habitat. We give the example, for example, of a bird that nests in trees but gets its food from either a river or in the ocean. Well, it can't nest in the ocean so you can't say its PCE needs for habitat for nesting are being met in the ocean. It can't catch the fish in the trees so you can't say that its need for food is being met in the forest and you're left with no critical habitat for those species. It simply makes no sense. Now, maybe if Congress had said, unambiguously, you've got to do this. You've got to have all primary constituent elements. And it said in the statute, well, I guess we just have to say that's what Congress chose. But it didn't say that. And it doesn't say that in the regulations either. Now, next you move to the question about when a species will be conserved. HomeBuilder says it doesn't really care so much about the how, which is really the most important thing. I mean, it's very important for the Fish and Wildlife Service to figure out how it is going to conserve a species, meaning get the species to a level at which it will be off the Endangered Species Act list. It just wants to know the when, which seems to me to be a pretty arbitrary question. And in this case is a good example of why the when would be so arbitrary. We're talking about vernal pool species. These are species that live in small depressions, which are inundated by water for only part of the year. Now, if it's a wet year, they're going to be inundated obviously much more. If it's a drought year, though, they might not be inundated at all. Now, these species have adapted. They're like four crustaceans and 11 plant species. They've adapted themselves to lie dormant for drought periods. Well, how much is it going to rain in this part of California and other states over the next 25 years? I don't know. The Fish and Wildlife Service doesn't know. Asking the Fish and Wildlife Service to come up with a projection, I think, is just absurd. It's beyond its expertise, and it would be a meaningless number. If there's going to be a drought for the next 30, for say 10 of the next 30 years, the species is not going to recover very quickly at all. If it's going to be unusually wet for the next 20 to 30 years, it could recover quite quickly. But where do you find, ultimately the question is, where do you find in the statute that it says that the Fish and Wildlife Service has to tell you when a species will recover? Congress never said that. And the Fish and Wildlife Service never imposed that burden on themselves. Even on the recovery plans, Congress didn't tie that to the designation of critical habitat. Now, Fish and Wildlife has been chastised by courts for blowing the deadline on designating critical habitat, which is tied to 12 months, and they can get a one 12-month extension from the listing of a species. But a recovery plan doesn't necessarily even contain such a projection, and usually doesn't as far as in my experience. And what's the point? What ultimately is the point? I think the district court judge in the Arizona cattle growers case got it right when she said, look, the Fish and Wildlife Service can figure out what a species needs to eat, to breed, to feed, to nest, etc. But to ask the Fish and Wildlife Service to go from that to when, and they don't really care about the how. They just want to know the when. And they want to know the when because it's not here, because it would be another technical excuse for trying to invalidate the species. So in any event, even when you do a recovery plan, you're not required to do that. Now, as far as including areas that don't contain any PCEs for the species, the Fish and Wildlife Service unquestionably said, and this is the only place that Home Builders gets it from, in the rule that they know there are things like driveways or buildings that these species aren't going to be using. And they defined them out of the definition of critical habitat by language in the final rule. Their discontent is that if you print out the final rule, you'll find page after page after page of legal description. And the legal description is not written down to the level of, well, there's a driveway on this ranchette, and the driveway is not part of the critical habitat. Or there's a house, or there's a barn. But it's been defined out in the rule by text. It just says it doesn't apply. They don't say that the service knowingly included something that they could have defined out by those meets and bounds definition at the end. And they don't concede that they could have done any better job on the mapping. I'm sorry, they don't dispute that, or they don't argue that the Fish and Wildlife Service could have done a better job. So, again, this is something not stated in the statute. Just so I understand, you're saying that there may be over-inclusion, but it's accidental, or there is an effort of Fish and Wildlife to exclude obvious structures or paved-over areas to say that they are not included in part of the habitat. So, for example, if somebody wanted to rip up their driveway and change it, they would not run into any problems with the definition. That is correct. I think the Federal Register knows. I think it's at 70 Fed Register 46930 that this is discussed. But the idea is that if it contains none of the PCEs, and the driveway wouldn't, maintaining the driveway wouldn't be a problem, maintaining the house. Now, if they wanted to double the size of their driveway, it's possible they could impact critical habitat. But they're not a federal agency. They're not subject to Section 7 consultation requirements. Their concern would be only if they caused the take of the species. But the driveway, the houses, the ranchettes, buildings, barns, whatever, they have been defined out, and a very detailed description is provided in the rule. It goes on for pages. As far as the occupied versus unoccupied, there are some unoccupied areas included. When I say unoccupied, I mean unoccupied by the vernal pool species. But this is allowed under the critical habitat designation requirements of the Endangered Species Act. The Endangered Species Act, Congress specifically said you could do this. You just have to meet the higher standard that is essential for the conservation of species. Fish and Wildlife Service said they met that standard. There hasn't been any argument back that they haven't met that standard. So these species are at risk. We say we met the standard. We don't get any counterargument that those unoccupied areas aren't essential. And so the argument simply falls. Finally, on the economic impact, I mean, this is another example of importing from another statute. In fact, it's actually more than importing from another statute. They, with, again, no reference to the text of the statute, start talking about the straw breaking the camel's back. And what they want Fish and Wildlife to do is to look at all sorts of regulation. I believe in their brief they say environmental regulation, but I'm not sure why they stopped there. But in other words, they're talking about regulation by the state of California, not just the federal government. And they're not just talking about the Endangered Species Act. They're talking about the Clean Water Act, any federal environmental statute. But I don't know why they have no logical stopping point. It might as well be OSHA regulations as well. And they want Fish and Wildlife when tasked with the narrow question of protecting the species to take into account all of the other economic impacts related to federal, state, and local regulation and factor them in. There's no basis for doing so. And I would point the Court to it's a more narrow question, but it implicitly rejects their argument. And that's the recent decision by another panel of this Court a couple of weeks ago in the Arizona cattle growers case. This is now I'm talking about the Ninth Circuit decision, where the question was, well, do you even include what are called the coextensive costs? And these are the costs that would be incurred in any event because of you list the species. Do you include that in your assessment of the economic impacts? And the panel in that case said no. They said logically you look at the addition. What are you adding to the situation? And that's what you're considering. So you don't look at the coextensive cost. You look at the so-called baseline cost, which would be what does designating critical habitat add to the situation above and beyond what already exists. And on that basis you make your decision. And in this case, in fact, Fish and Wildlife excluded some areas on an economic basis. So they took it seriously. Implicitly I think from that, although the specific argument here, the much broader argument was not presented to the panel in that case. I think it's implicit that if you're not even going to look at the listing cost, you wouldn't be looking at cost of California statutes, the Clean Water Act, et cetera. In other words, these are costs that are going to be incurred in any event. There's, just to sum up again, although we hear a lot about, well, this is all required by the statute, just do not hear what part of the statute says it. Where does it say this? This is really a Chevron. If this, if Homebuilder's arguments are to prevail, they're really a Chevron step one type of argument. They're a plain language argument. There needs to be plain language in the statute requiring the Fish and Wildlife to do things, which at least I think most people would agree are illogical and will in fact impair recovery of the species. But they don't do that. They don't give you the plain language. So on that basis, we would ask that the Court affirm the district court's decision. Thank you. Thank you. Thank you, Your Honors. Just a few points on rebuttal. First of all, with respect to unoccupied critical habitat, the service again concedes that it has included unoccupied critical habitat within the designation, but it says it's okay because it's made all the findings that unoccupied critical habitat requires. But as we explain in the briefs, unoccupied critical habitat by definition cannot exist within occupied critical habitat. The way the statute defines critical habitat, there's occupied and unoccupied, and unoccupied critical habitat is defined by definition as those areas outside the current range of the species. And yet the service also says that it is designated only occupied critical habitat, meaning the areas within the current range of the species. So the service can't have it both ways. It cannot say that it's met the standard for an unoccupied critical habitat and yet include that same area within occupied critical habitat. Well, I thought what the service was saying here was that the standard for unoccupied is a more stringent standard of essential to the species recovery and that they had met that higher standard with respect to unoccupied territory. You're correct, Your Honor, that that is the standard, but it's sort of a two-step analysis. It's the quality of the habitat, and that implicates your question regarding whether it needs to be essential or not. And secondly, the location of the habitat. And the statute itself expressly says that unoccupied critical habitat includes those areas outside the current range of the species. So you cannot say that there's unoccupied critical habitat within occupied critical habitat. It's a logical contradiction. It's saying that the species is both there and not there. It's both within its range and outside of its range at the same time and in the same place. That cannot happen. With respect to the question of the standard that we supposedly seek to impose upon the service, that this is impossible, this is the exact same argument that the service said with respect to the 90-day deadlines or the one-year deadlines that the petition process under the ESA imposes. The service routinely fails to meet those deadlines because of manpower questions, because of budgetary questions. But that does not exempt the service from still having to abide by those deadlines. And when the service violates those deadlines, a party can seek redress in the court and obtain a judicial decree ordering the service to abide by those deadlines. By what's the deadline they missed here? Under the section 4 of the ESA, there's a petition process. And there's a 90-day deadline and a one-year deadline. And the service routinely violates those deadlines because of the same excuses that are given here, because they don't have the ability to do what they need to do within the time allowed. And yet the courts do not excuse those violations. Kennedy. You said they violated. Now, what is it they violated? With respect to what, out of this myriad of challenges, what is it that they – what was the prejudice or the impact on you, your clients? The prejudice, returning to the original question from Judge Reimer, the prejudice is that we have here a designation of critical habitat that includes areas that, frankly, will not serve the conservation of species. Nevertheless, it imposes a real economic burden upon us. So that is the injury. And the injury – Tie it to the violating the deadline. You have a deadline, but it doesn't relate to the end product. What of the end product has been made deficient by the blowing of the deadline? Your Honor, I – forgive me. I don't mean to say that these 90 or one-year deadlines are applicable in this case. I'm simply drawing an analogy to the fact that this Court and other courts have said that the service can't get around these other statutory deadlines. What's the deadline that's relevant here? We'll all accept your premise that we'll slap their hands or whatever. The reason why it's relevant, Your Honor, is it shows that the service's purported defense in this case, that we just can't do this. This is too difficult. We don't have enough time. We don't have enough manpower. That defense has been rejected in other circumstances under the Endangered Species Act. Well, I think what he – as I understood what the counsel was arguing today is that he's taking your argument, saying to impose a requirement for us to project in 25 years into the future is not within our competency. And unless there's some obligation that they are required to do it, it's simply saying your proposal that it be implied is – doesn't make any sense. So where's the statutory deadline that they're blowing? Well, with respect to knowing the endpoint of conservation, it goes straight – notwithstanding what my respected colleague contended to the otherwise. The statute itself defines critical habitat as containing those physical or biological features essential to the conservation of the species. I do not understand how one can identify what features essential to the conservation of a species can be unless one knows what the conservation of the species is. Well, food. That's sort of an obvious thing without knowing whether or not they'll – They'll come and eat it. Yeah. The difficulty, Your Honor, with simply saying food or water or air is that all species need that. And therefore, the service could ostensibly designate any habitat. Well, they haven't gone that far. But the rationale, Your Honor, by which they support the legality of that critical habitat designation is, in fact, this rationale, that all that they need do is determine what are essential things to keeping the species in survival, to keep it – They seem to have done some finite, as I read their plan. I mean, they even shrank the acreage part of their consideration. So they aren't just saying, well, wherever there's water, light, and air, that's not how they got there. No, that's true, Your Honor. They did reduce it, but not on these grounds, on economic impact grounds. But with respect to the economic impact analysis, the only point that I wish to make on rebuttal is that, for example, in NEPA, a federal agency is required to assess the impact of a federal project if it has a significant impact on the human environment. And – That's what NEPA says. Right. Exactly. But the Endangered Species Act says to assess the impact, economic and otherwise, of the critical habitat designation. Both analyses are focused on the action, and yet both analyses should also understand – But why didn't Congress say the same language in the Endangered Species Act? Well, if anything, Congress adopted a broader, more inclusive terminology by saying that even if the critical habitat designation is not significant, the impact should still be assessed. And yet in NEPA and in the Section 7 context under the Endangered Species Act, there is a cumulative impacts analysis. There's no reason why that same analysis should not be – Well, isn't the focus of NEPA those – the protection – the focus of the Endangered Species Act requirement is what harm are we doing to property owners by imposing this additional designation on them? Versus in NEPA, what we're talking about is what harm is being done to the environment by the particular designation. So it's a different assessment. And isn't it true that, you know, that had Congress intended the kind of analysis you're – you suggest should have been done here, they could easily have spelled that out? There's no question, Your Honor, that Congress can always speak more specifically. But we believe that Congress has spoken specifically enough in that the only way to do an honest and fair assessment of the impact of any activity is to judge that impact in relation to the baseline, in relation to what's going on in the real world. But they're arguing that the baseline includes all of those other regulations that are just out there, that we start there and we then look at what additional harm or difficulty is imposed by the designation. Without question, Your Honor, there should be a full baseline analysis of what is going on in any given area before a critical habitat is designated. But that is used to determine what is the aggregate effect of designating any given area as critical habitat. I see that I'm well over my time. Thank you, Your Honor. Thank you, counsel. We appreciate the argument from both counsels. Very helpful. It's a complicated case in some respects. Case argued as submitted.
judges: Pallmeyer, Rymer, Fisher